IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 25-213 |
| LUIS MANUEL VENTURA | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Luis Ventura assisted his uncle Wilson Rosario, an illegal alien from the Dominican Republic, in distributing, and possessing with intent to distribute, over four kilograms of fentanyl. There is no dispute that Ventura, who was present legally in the United States and attending school, was used by his uncle in the drug trade. The future that Ventura had as a student-athlete in the United States was sadly extinguished by the nefarious actions of his uncle.

Ventura, however, was a 20-year-old man at the time he directly delivered lethal doses of fentanyl to customers on behalf of his uncle. That fact, combined with the staggering amount of fentanyl that he stored in his bedroom for his uncle, requires accountability. This need for accountability is compounded by the fact that these drugs were stored next to an elementary school and playground used by children.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

---

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors.

*continued* . . .

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors**.**

I.    **BACKGROUND**

On November 25, 2025, the defendant pled guilty to Counts One, Three and Four of the Indictment. During his plea colloquy, the defendant admitted to the following facts.

**COUNT ONE (conspiracy)**

**April 20, 2023 – Controlled purchase of 12.07 grams of fentanyl**

On April 20, 2023, an agent assigned to the Pennsylvania Attorney General's Office, Bureau of Narcotics Investigation ("BNI") met with a confidential source ("CS") to arrange a

---

*See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

controlled purchase of 12 grams of fentanyl from Wilson Rosario. After a phone call was made with Rosario, the CS stated that he was directed to travel to the 700 block of North Morris Street in Allentown, Pennsylvania. Investigators searched the CS and the CS's vehicle and found them both to be free of money, drugs, and contraband. Investigators provided the CS with $480.00 in pre-recorded U.S. currency to purchase fentanyl from Rosario. At approximately 3:15 p.m. Rosario arrived in a black Hyundai Sonata and parked in the 700 block of North 7th Street. Rosario then entered the passenger side front door of the CS's vehicle, exited a short time later, and then entered the front door of 729 North 7th Street.

Investigators followed the CS to a pre-arranged meeting location, where the CS turned over a knotted plastic bag containing suspected fentanyl. The CS stated that the CS gave Rosario the pre-recorded U.S. currency in exchange for the drugs. The CS was again checked for money or contraband and none was found. Subsequent testing by the Pennsylvania State Police Forensic Laboratory confirmed that the substance was in fact 12.07 grams of fentanyl.

**July 19, 2023 – Controlled purchase of 27 grams of fentanyl**

On July 19, 2023, BNI agents met with the CS to conduct a controlled purchase of 250 packets of fentanyl from Rosario. At approximately 11:45 a.m., the CS contacted Rosario and arranged to purchase 250 packets fentanyl for $250.00. Rosario advised that he would "front" the CS an additional 15 "bricks" of fentanyl and told the CS to meet him at 12:15 p.m.

Investigators searched the CS and the CS's vehicle for money, drugs and contraband and did not find any. They provided the CS with $250.00 in pre-recorded U.S. currency to make the purchase. Investigators conducting surveillance located Rosario in a black Hyundai Sonata in the area of North 7th and Green Streets in Allentown. Rosario got out of the vehicle while Luis Ventura entered the driver seat and drove the car away. The CS received a call from Ventura

who advised the CS to travel to the gas station at 15th and Tilghman Streets in Allentown. Investigators followed the CS to the gas station.

At approximately 12:15 p.m. investigators observed Ventura exit 823 West Chew Street and then drive the black Sonata to the pre-arranged meeting location. At approximately 12:32 p.m., investigators observed Ventura enter the passenger side of the CS's vehicle and exit a short time later. The CS then returned to the pre-arranged meeting location, and gave the agents over 20 bricks, each containing approximately 50 packets (1000 packets in total) of suspected fentanyl wrapped in yellow paper. The CS stated that they purchased the fentanyl from Rosario's associate Ventura for $250.00. The CS stated that there was no additional talk about money owed for the fronted 15 bricks, but that they would expect to owe Rosario $750.00 at a later time. Investigators observed Ventura drive the black Sonata back to 823 West Chew Street. Subsequent testing of the suspected fentanyl by the Pennsylvania State Police Forensic Laboratory concluded that the substance in the 1000 packets was 27 grams of xylazine and fentanyl. Seven of the fourteen packets also contained heroin.

### August 4, 2023 – controlled purchase of 4.1 grams of fentanyl

On August 4, 2023, BNI agents conducted surveillance in the areas of 729 North 7th Street and 823 West Chew Street, in Allentown. At approximately 8:47 a.m., an agent observed Ventura get out of the black Sonata and enter the front door of 729 North 7th Street. A short time later, Rosario and Ventura got into the black Sonata and drove to West Chew Street near Lumber Street. Rosario got out of the car and walked into the rear basement entrance of 823 West Chew Street, 1st Floor. Ventura got out of the car and entered the house via the front door of 823 West Chew Street, 1st Floor.

Agents met with the CS to arrange a meeting with Rosario to pay him the $750 for the

previously "fronted" fentanyl from July 19, 2023. At approximately 10:48 a.m. the CS called Rosario and arranged the payment to take place at the Family Dollar, located at 9th and Turner Streets in Allentown. Investigators checked the CS and the CS's vehicle for money, drugs and contraband and did not find any. They provided the CS with $750 in pre-recorded U.S. currency. Surveillance was set up at the Family Dollar, and investigators also followed the CS to that location.

At approximately 11:23 a.m., investigators observed Rosario and Ventura exit the front of 823 West Chew Street, 1st Floor and walk to the Family Dollar. Rosario entered the front passenger side of the CS's vehicle at approximately 11:27 a.m. and exited shortly thereafter. The CS then left the parking lot and when they reached Lumber and Chestnut Streets, Ventura entered the CS's vehicle. The CS traveled east on Chestnut Street to 8th Street, where investigators observed Ventura get out of the CS's vehicle and walk north on 8th Street and enter 823 West Chew Street, 1st Floor. Rosario also walked back and entered the rear basement door of 823 West Chew Street, 1st Floor.

The CS met investigators at a pre-arranged location and turned over 6 "bricks" of drugs wrapped in yellow paper, each containing approximately 50 packets of suspected fentanyl. The CS stated that Rosario got into the CS's car at the Family Dollar and the CS paid him the $750 for the "fronted" fentanyl. The CS then said that he picked up Ventura in the alley, who provided the CS with six more bricks of "fronted" fentanyl. The CS said that Ventura told the CS to drive and then got out of the CS's vehicle near Chestnut and 8th Streets. Subsequent testing by the Pennsylvania State Police Forensic Laboratory revealed that the suspected fentanyl weighed approximately 4.1 grams and contained xylazine and fentanyl.

**August 22, 2023 – Controlled purchase of 19 grams of fentanyl**

On August 22, 2023, agents met with the CS to contact Rosario and to arrange a meeting to pay him $300 for previously "fronted" fentanyl as well as purchase more fentanyl. The CS stated that they had spoken with Rosario the day prior, and that he told the CS that they needed to get larger amounts of fentanyl when making purchases. The CS also stated that Rosario would "front" the CS 25 bricks of fentanyl on the next purchase. The CS contacted Rosario at approximately 12:00 p.m. and Rosario agreed to meet for the payment and additional fentanyl, but said "my son" will see you. At approximately 12:11 p.m. the CS was called by Ventura who told the CS that he would meet him shortly near 823 West Chew Street. Surveillance units watching 823 West Chew Street observed Ventura arrive in the black Sonata, park the car, and enter the front door of 823 West Chew Street, 1st Floor.

Investigators searched the CS and the CS's car for contraband, drugs and money and found none. They provided the CS with $300 in pre-recorded U.S. currency for payment of the prior "fronted" fentanyl and purchase of additional fentanyl. Investigators followed the CS to 823 West Chew Street, 1st Floor. At approximately 12:46 p.m. investigators observed Ventura exit the front of 823 West Chew Street, 1st Floor, carrying a gray plastic shopping back. Ventura then met with the CS and provided the CS with the shopping bag before walking back into 823 West Chew Street, 1st Floor.

The CS returned to a pre-arranged meeting location and provided investigators with the gray shopping bag that contained 25 bricks of yellow paper packages, each containing approximately 50 packets of suspected fentanyl. The CS stated that they paid Ventura the $300 in pre-recorded money for the "fronted" fentanyl and that Ventura gave the CS the gray plastic shopping back containing the 25 bricks of fentanyl. Subsequent testing by the Pennsylvania State

Police Forensic Laboratory revealed that the substance in the 25 bricks contained approximately 19 grams of xylazine and fentanyl.

**COUNT THREE (Possession with intent to distribute controlled substance within 1,000 feet of a protected location)**

**August 26, 2023 – Search Warrant – 823 West Chew Street, Apt 1, Allentown, PA. – approximately 1,069 grams of Fentanyl**

On August 26, 2023, at 10:10 a.m., BNI agents served a Commonwealth of Pennsylvania search warrant at 823 West Chew St., Apt. 1 Allentown, Pennsylvania. Upon entry into the residence, agents encountered Rosario. During a search of the residence, agents seized a total of approximately 298.96 grams of fentanyl as well as a hydraulic press, a respirator, empty fentanyl kilogram wrappers with residue, digital scales, vacuum seal bags, a vacuum sealer, plastic wrap, small wax packets, Narcan, grinders, cutting agent, rubber bands, and other material consistent with preparing fentanyl for distribution. Agents also seized $443.00 U.S. currency inside the residence.

While agents searched the residence, Luis Ventura arrived at the rear of the residence in the black Sonata, got out of the car, and approached the rear of 823 W. Chew Street. Upon seeing law enforcement officers, he quickly got back into the car and tried to drive away. Ventura was stopped shortly thereafter by the Allentown Police and taken into custody.

The apartment located at 823 West Chew Street, Allentown, where investigators found Rosario, along with 298.96 grams of fentanyl and distribution materials, is located across the street (approximately 100 feet) from the Central Elementary STREAM Academy. This school is a public school within the Allentown School District, located at 829 West Turner Street, Allentown, Pennsylvania. Additionally, next to the elementary school is a playground.



**COUNT FOUR (Possession with intent to distribute a controlled substance within 1,000 feet of a protected location)**

**August 26, 2023 – Search Warrant – 1353 West Chew Street, Allentown – approximately 4,285 grams of fentanyl**

At 10:39 a.m. the same day, BNI agents served a Commonwealth of Pennsylvania search warrant at 1353 West Chew Street, Apt. 1, Allentown, Pennsylvania. Once agents made entry, they met the owner of the apartment who told investigators that she rents rooms in her apartment to help pay rent and that a male known as "Luis" rents one of the rooms. When shown a photograph of Ventura, the owner confirmed that he is the renter she knows as "Luis" and that he has a key to the front door. She stated that his room was the 2nd room from the bathroom. No contraband was located during a search of Apartment 1 and investigators refrained from searching the 2nd room from the bathroom since this was outside the scope of their search warrant. They secured the residence and sought and obtained a search warrant for the 2nd room from the bathroom.

At approximately 2:50 p.m., investigators served a new search warrant for 1353 West Chew Street, Apt. 1, 2nd room from the bathroom, which was identified as Ventura's bedroom.

Inside the room, among other items, investigators found a black suitcase containing four vacuum sealed packages of suspected fentanyl, Narcan, a respirator and empty vacuum seal bags. Investigators recovered a total amount of approximately 3,973.8 grams of fentanyl.



*Bulk fentanyl recovered from Ventura's bedroom located at 1353 West Chew Street, Allentown, Pennsylvania.*

The apartment located at 1353 West Chew Street, Allentown, where investigators found 3,973.8 grams of fentanyl and distribution materials in Ventura's bedroom, is located within 1,000 feet (approximately 300 feet) of the real property comprising Franklin Park, located at 214 North 14th Street, Allentown, Pennsylvania.



At approximately 2:54 p.m., investigators also served a state search warrant at 729 North 7th Street, Apt. 2, Allentown, Pennsylvania. Inside the apartment investigators recovered among other items, $2,986.00 U.S. currency and a passport from the Dominican Republic for Wilson Jose Rosario.

Subsequent testing of the suspected fentanyl recovered at all of the search warrant locations was performed by the Pennsylvania State Police Forensic Laboratory. Testing concluded that approximately 4,272.76 grams contained fentanyl or a mixture containing xylazine and fentanyl. Combined with the 62.17 grams of fentanyl recovered from the four controlled purchases conducted by law enforcement in this case, the total amount of fentanyl that the defendant is responsible for in this case is 4,334.93 grams.

After signing a written *Miranda* waiver, Rosario told investigators that all of the drugs found at 823 West Chew Street and 1353 West Chew Street were his and no one else's. He also stated that Ventura had nothing to do with this.

Ventura also signed a written *Miranda* waiver and told investigators that he resides at 729 North 7th Street. He stated that has been working with his uncle, Wilson Rosario, for five months. He stated that he would go to 823 Chew Street to count or put together the bundles of fentanyl. He admitted that there was fentanyl in a suitcase at 1353 West Chew Street, but that it was his uncle's and that he didn't know what it was for.



*Drugs and distribution materials recovered from the search warrants in this case.*

## II.      SENTENCING CALCULATION

### A.      Statutory Maximum Sentence.

The maximum sentence that may be imposed on the defendant is a term of imprisonment of life imprisonment, a lifetime term of supervised release, a fine of $50,000,000, and a special assessment of $300. There is a mandatory minimum term of imprisonment of 10 years on each Count, and a mandatory minimum term of supervised release of 5 years on Count One and 10 years on Counts Three and Four.

### B.      Sentencing Guidelines Calculation.

**Base Offense Level:** The guideline for a violation of 21 U.S.C. § 860 is USSG § 2D1.2. The base offense level is calculated by applying two levels to the offense level from §

2D1.1 applicable to the quantity of controlled substances directly involving a protected location. In this case, 4272.76 grams of fentanyl were seized from residences linked to the defendants, both of which were located within 1,000 feet of a protected location. The offense level from § 2D1.1 is 31. Therefore, the base offense level for § 2D1.2 becomes 33 USSG 2D1.2(a)(1). (*PSR* at ¶40.)

> **Base Offense Level (§ 2D1.1**): Because the offense involved at least 4 kilograms but less than 12 kilograms of fentanyl, the offense level specified is 34 in USSG § 2D1.1(c). However, since the defendant receives an adjustment under § 3B1.2 and the base offense level under subsection (c) is 34, the offense level decreased by 3 levels, and the base offense level becomes 31. § 2D1.1(a)(5)(A) and (B)(ii). *(PSR at ¶40)*

> **Specific Offense Characteristic (§ 2D1.1**): The defendant stored fentanyl in his residence at 1353 West Chew Street. Because he maintained a premises for the purpose of manufacturing or distributing a controlled substance, the offense level increased by two levels, to an offense level of 33. USSG 2D1.1(b)(12). *(PSR at ¶40)*

> **Specific Offense Characteristic (§ 2D1.1):** Ventura, who has no criminal record and was in the United States on a student visa, was told by his uncle, a man that he respected and admired, he had to participate in the conspiracy if he wanted a place to stay. The offense level is decreased by two levels, to an offense level of 31, because the criminal activity was motivated by a familial relationship, he received no monetary compensation from the illegal purchase, sale, transport, or storage of controlled substances, and he had minimal knowledge of the scope and structure of the enterprise. USSG § 2D1.1(b)(17). *(PSR at ¶40).*

**Adjustment for Role in the Offense:** During an interview with investigators, Rosario claimed that all of the drugs were his. Also, Ventura did not receive any monetary compensation from his involvement, and he had minimal knowledge of the scope and

structure of the enterprise. Because the defendant was a minimal participant, the offense level decreased by four levels. USSG §3B1.2(a). (*PSR at 42.*)

**Adjusted Offense Level: 29**

**Zero-Point Offender**: Pursuant to USSG §§ 4C1.1(a)(1)-(11) and 4C1.1(a) and (b), the offense level is reduced by two levels. *(PSR at ¶45)*

**Acceptance of Responsibility**: Pursuant to USSG § 3E1.1(a) and (b), three levels are subtracted. *(PSR at ¶46 and ¶47).*

**Total Offense Level: 24**

**Criminal History Category = I**

**Guidelines**

The Government agrees with the probation department that based upon a total offense level of 24, and a criminal history category of I, the guideline range is **51-63 months.**

### III.   <u>ANALYSIS</u>

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### A.    Consideration of the 3553(a) Factors Regarding Imprisonment.

Although Ventura was led astray by his uncle into drug trafficking, Ventura is an intelligent, 20-year-old man, who participated in a dangerous enterprise, literally peddling poison that kills people and destroys communities. This Court is all too familiar with the dangers of fentanyl, as the social, economic, and health impacts in this district. Each day three or more people die in Philadelphia of a drug overdose. Dozens more are estimated to experience non-fatal overdoses every day, but experts believe that the tracking of those incidents is underreported. In 2023, 79% of the 1,315 overdose deaths in Philadelphia involved fentanyl.[2] In Allentown, Pennsylvania, where the defendant stored and distributed his massive quantities of fentanyl, 592 people have died since 2020 from a mixed toxicity that includes fentanyl.[3]

Ventura, a baseball standout from the Dominican Republic, had achieved a rare opportunity to leave the Dominican Republic and study and play baseball in the United States on

---

2 *See* DEA, Operation Engage – Philadelphia, https://www.dea.gov/operation-engage/philadelphia#:~:text=This%20chart%20examines%20the%20rate,prevent%20overdose%20deaths%20from%20occurring (last accessed April 14, 2026).
3 According to the Lehigh County Regional Intelligence and Investigative Center as of January 2026.

a scholarship. When finances fell through, and he was not able to afford to continue to attend an expensive private school, Ventura sought help from the only place he could think of – family. He made the decision to reside with his uncle – Wilson Rosario – in Allentown until he could apply to a cheaper school. Ventura would come to regret that decision.

Ventura learned quickly that his uncle's generosity came with strings attached. He asked Ventura to store large quantities of fentanyl. Moreover, he would have to drive the defendant around and even engage in some drug sales as a proxy for his uncle. This case sadly provides a front-row seat to watch how a drug dealer is created.

Rosario remained callous as he groomed his nephew for the drug trade. When Ventura asked questions or objected to involvement with drugs, he was chastised and told to mind his own business. Over several months, Rosario watched his young nephew learn how to package fentanyl and later become a novice drug dealer. Rosario may not have even been aware that the first night Ventura had to sleep in his room with four kilos of bulk fentanyl, that Ventura nearly overdosed on just the odors from the dangerous drugs. Fortunately, a friend intervened and took Ventura to get fresh air.

Rosario cold-heartedly watched as a young man with the potential of a promising future in front of him, lost those wonderful opportunities. Rosario kept the profits earned through drug trafficking and did not give Ventura any of the money. Perhaps Rosario thought his terse confession upon arrest claiming responsibility for all the drugs would achieve some level of absolution. Ventura, however, was arrested and indicted on these charges, and will likely be

- 15 -

removed from the United States, with little possibility for a legal return to the United States anytime in the extended future.

It is clear that a term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." § 3553(a)(2). Ventura, although preyed upon by his uncle, sold thousands of packets of heroin on the streets of Allentown, fueling the opioid epidemic and endangering possibly hundreds of users. Moreover, he slept in a room with four kilos of fentanyl – enough to kill every person in Allentown. A sentence of incarceration affords adequate deterrence to others who would commit a similar offense and protects the public from further crimes of the defendant, for at least as long as he remains incarcerated. *Id.*

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." § 3553(a)(2)(D). Also, restitution is not an issue in this case. § 3553(a)(7).

The defendant must be held responsible for his own actions, while understanding the context as to why and how he committed the offenses. The damage Wilson Rosario caused to Ventura's future in the United States is unfortunate. For his part, the risk of danger Ventura caused others in the Lehigh Valley is immense. The toll of the suffering caused to individuals struggling through addictions who purchased fentanyl from Ventura will likely never be fully known. As explained above, all the appropriate considerations of sentencing, such as the nature of the offense and the character of the offender, call for a term of incarceration in order to protect society, and also provide general deterrence to other aspiring drug traffickers who seek to profit off of others' misery.

## IV.    CONCLUSION

For these reasons and subject to any that may be presented at the defendant's sentencing hearing and in the Sealed Supplement, the government believes that a sentence of imprisonment accounts for the nature, circumstances, and scope of the defendant's criminal conduct in this case.

Respectfully submitted,

DAVID METCALF
United States Attorney


*/s Robert W. Schopf*
ROBERT W. SCHOPF
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this Sentencing Memorandum has been served on the Filing User

identified below through the Electronic Case Filing (ECF) system:

Robert Patterson, Esq.
Counsel for Luis Ventura

/s Robert W. Schopf
ROBERT W. SCHOPF
Assistant United States Attorney

DATED:  May 21, 2026.